# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00090-SCT

*ALADDIN CONSTRUCTION COMPANY, INC.,
BRIGHTWAY SERVICES, INC., JONES SIGN
COMPANY, INC. AND ROBERT JOE HILL d/b/a
J-N-H CONSTRUCTION*

*v.*

*JOHN HANCOCK LIFE INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/28/2004 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOSEPH Q. WHITE, JR. |
| | JOHN G. McDONNELL |
| | HENRY P. PATE |
| ATTORNEY FOR APPELLEE: | RICK ANDREW LA TRACE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 10/27/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. In July of 1999, John Hancock Mutual Life Insurance Company ("John Hancock"), owner of Singing River Mall, entered into a contract with McMo, Inc. ("McMo") to provide project management services, in addition to design and construction documentation services, for a renovation of the mall. The contract provided that McMo's role in the later stages shall be construction leader, acting in the interests of John Hancock and directing the contractors (the "Fabricator/Suppliers"). Thereafter, McMo entered into separate agreements with Aladdin

Construction Company, Brightway Services Inc., Jones Sign Company, and J-N-H Construction ("Plaintiffs"), as contractors, whereas McMo is identified as the "construction manager," retained by "Owner" John Hancock. John Hancock routed all payments due the Plaintiffs through McMo, up to the full contract price. However, McMo failed to pay either all or part of what was owed to each Plaintiff. McMo subsequently filed for bankruptcy. Plaintiffs now seek payment from John Hancock first arguing inter alia that McMo acted as an agent of John Hancock, so as to bind John Hancock under agency law. John Hancock argues that McMo was not its agent, but rather a general contractor and Plaintiffs, should be considered subcontractors who, by failing to timely utilize Miss. Code Ann. § 85-7-181 (1999) (the "stop notice" statute), are estopped from recovery against John Hancock.

**FACTS**

¶2. On July 30, 1999, John Hancock entered into a Mall Renovation Agreement with McMo providing that McMo would engage in "design, construction documentation and project management consulting services" at Singing River Mall. Specifically, McMo contractually agreed to solicit and analyze bid proposals,[1] make recommendations to John Hancock therefrom,[2] negotiate construction agreements with Fabricator/Suppliers [Plaintiffs] *for* John

---

[1]"Solicit, Receive and Analyze Implementation Bids. We will solicit and receive bid proposals from the pre-qualified firms. After our initial analysis for responsiveness, we will forward copies of all bid proposals received to [John Hancock] together with our comments."

[2]"Recommend Fabricator/Suppliers. ... [W]e will make our Fabricator/Supplier(s) recommendation to [John Hancock]."

2

Hancock,[3] route payments from John Hancock to Fabricator/Suppliers,[4] and oversee the supervision, control, and selection of third-party services.[5] Throughout, McMo was to act in the interests of John Hancock.[6] The John Hancock-McMo contract specifically stated that, "[n]either McMo nor its employees are employees of [John Hancock] for any purpose whatsoever, but are Independent Contractors. McMo and its employees shall have sole control over the manner and means of their performance under this agreement." However, the designation of McMo as not an employee, but rather an independent contractor, does not foreclose the inquiry of whether McMo was also an agent vel non. A party can be both an

---

[3]"Negotiate Construction Agreement(s). We will negotiate with the Fabricator/Suppliers mutually selected by [John Hancock] and McMo for the execution of agreements between the Fabricator/Suppliers and [John Hancock]. We will use an agreement [John Hancock] has approved."

[4]"Manage Construction Funds and Pay Applications. We will receive, process and approve all applications for payment submitted by Fabricator/Suppliers. We will submit a summarized package to [John Hancock] on a monthly basis containing all approved pay applications and necessary paperwork for check preparation by [John Hancock]. [John Hancock] will route all payments *through* McMo." (emphasis added).

[5]Including two provisions which distinctly distinguish between the Fabricator/Suppliers [Plaintiff-Appellants] and subcontractors. Those provisions are:
"Obtain and Monitor Certificates of Insurance. We will, on behalf of the Client, set up systems to monitor the Fabricator/Suppliers (and *their subcontractors*) compliance with the Client's insurance requirements for the project." (emphasis added).
"Obtain and Verify Lien Waivers. We will set up systems for, and monitor, the Fabricator/Suppliers' submissions of lien waivers, including those of subcontractors of any tier with lien rights."

[6]The Project Profile section of the John Hancock-McMo contract states, "[s]imilarly, in the latter phases our role shall be construction leader, *acting in the interests of [John Hancock] ... .*" (emphasis added).

independent contractor and an agent as the two roles are not mutually exclusive.[7] The "Recommend Fabricator/Supplier(s)" provision, the "Negotiate Construction Agreement(s)" provision, and the "Manage Construction Funds and Pay Applications" provision of the John Hancock-McMo contract are clearly atypical of the role of a general contractor. Unquestionably, McMo was subject to John Hancock's control as to its conduct. Moreover, the John Hancock-McMo contract submitted that apart from life-safety issues, "[John Hancock] shall not communicate directly with the Fabricator/Suppliers, and shall refer all inquiries from any of them to McMo." None of the Plaintiff-Appellants were signatories to the Mall Renovation Agreement between John Hancock and McMo.

¶3.     McMo then contracted with each Plaintiff to perform renovation work on Singing River Mall. Each Plaintiff entered into a separate contract with McMo. These contracts specifically refer to each Plaintiff as "Contractor,"[8] John Hancock as "Owner," and McMo as "Construction Manager." Each contract also defined "construction manager" as "McMo Incorporated, retained by agreement with Owner to provide construction management services." The

---

[7]The Comment to the Restatement (Second) of Agency § 2 (1958) states:

> An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal. ... Although an agent who contracts to act and who is not a servant is therefore an independent contractor, not all independent contractors are agents. Thus, one who contracts for a stipulated price to build a house for another who reserves no direction over the conduct of the work is an independent contractor; but he is not an agent since he is not a fiduciary, has no power to make the one employing him a party to a transaction, and is subject to no control as to his conduct.

[8]*Not* "Subcontractor." Furthermore, Plaintiff Jones Sign signed a *Contractor's* Affidavit, *not* a *Subcontractor's* Affidavit.

4

payment clause specifically provided for the Plaintiffs "to submit to Construction Manager its monthly application for payment promptly on the date established by Construction Manager, so as to enable Construction Manager to forward the application to Owner for payment." Essentially, the contract called for all services to be performed under the oversight, and to the satisfaction, of both McMo and John Hancock.[9] Despite the required approval of both McMo and John Hancock, Plaintiffs were contractually required to direct all dealings to McMo.[10] This requirement was particularly significant given the contractual presence of a "pay-when-

---

[9]Article 9.13 states: "Construction Manager shall have the right to require, at any or all progress meetings, whether called by Owner, Construction Manager or others, the presence of Contractor, or a representative of Contractor authorized to act on its behalf."
    Article 3.1 states: "All services required hereunder shall be performed to the reasonable satisfaction of Construction Manager and Owner ... Contractor shall perform hereunder at the direction of the Construction Manager."

[10]Article 9.18 states: "Contractor understands and agrees that it shall not deal directly with representatives of Owner, but shall handle all matters connected with this Agreement, the Work, or the furnishing of labor or materials or payment therefore, exclusively through Construction Manager unless otherwise directed in writing by Construction Manager."

paid" provision.[11]    Finally, the contract expressly required John Hancock to be named as one of the insureds under applicable insurance policies.[12]

¶4.    According to Tina Dubose, General Manager for the Singing River Mall, upon receipt of the Plaintiffs' pay applications, McMo would forward an invoice directly to John Hancock and John Hancock would then review and approve the invoice for payment.    Thereafter, John Hancock would forward the McMo invoice to Dubose with instructions to draft a check drawn on John Hancock's Singing River Mall operating account, *payable only to McMo.*[13]

¶5.    John Hancock forwarded to McMo all monies which were due to the Plaintiffs, and monies due for McMo's separate fees.[14]    Instead of making payments to Plaintiffs from the payments received from John Hancock, McMo used the funds for other purposes.    McMo

---

[11]Article 5.5 states: "Notwithstanding any other provision of this Agreement, Construction Manager shall be under no obligation to make payment to the Contractor under any provision hereof except to the extent that Construction Manager has received funds from Owner, payment by Owner being a *condition precedent* to payment of the Contractor."  (emphasis added).  As Article 9.18 required all dealings to be directed toward McMo, then Plaintiffs were necessarily reliant upon McMo's statements regarding payment by John Hancock.  Since McMo was only to pay Plaintiffs upon receipt of payment from John Hancock under Article 5.5, the combination of Article 9.18 and Article 5.5 prohibited the Plaintiffs' utilization of the stop-notice provisions of Miss. Code. Ann. § 85-7-181.

[12]This provision, among others, establishes rights and benefits retained by John Hancock under the contract, despite its absence as a signatory to the contract.

[13]Not routed *through* McMo as stated in the John Hancock-McMo contract.

[14]"The last payment by John Hancock made to McMo, Inc., for Vendor Funds Escrow and [separate] fees [due] to McMo, Inc., for the Singing River Mall project was by check No. 002994 dated July 12, 2000, in the amount of $149,400.00, drawn upon the Singing River Mall Operating Account ... .  In addition, McMo was paid $5,094.68 by check No. 003071 dated August 3, 2000 drawn upon the Singing River Mall Operating Account for reimbursable expenses."

failed to pay Plaintiffs, falsely insisting that it was waiting on payment from John Hancock, and became insolvent soon after. With McMo insolvent, Plaintiffs sought recovery from John Hancock arguing that McMo was an agent of John Hancock.[15] Separate actions were filed in both the Circuit Court of Jackson County and the Chancery Court of Jackson County. The circuit court case was transferred to chancery court, and all cases were then consolidated.

¶6. The Jackson County Chancery Court concluded that there were no genuine issues of material fact and granted John Hancock's motion for summary judgment. The chancellor found that McMo was acting as a general contractor under this Court's definition found in ***Associated Dealers Supply, Inc. v. Mississippi Roofing Supply, Inc.,*** 589 So. 2d 1245, 1247-48 (Miss. 1991). In essence, the chancellor determined that McMo had total control over the manner and means of performance under the contract, that no Plaintiffs had direct contact with John Hancock, and that John Hancock paid McMo prior to proper notice of non-payment or the filing of a mechanic's lien by any Plaintiff. Furthermore, the chancellor held that there was no agency relationship, explicit or implicit, between McMo and John Hancock.

**ANALYSIS**

¶7. In seeking a reversal and remand to the chancery court for a trial on the merits, the Plaintiffs raises numerous issues on appeal. It appears that the relief sought is controlled by two overriding, dispositive issues: (1) Was McMo a general contractor or an agent of John

---

[15]Plaintiffs also alleged that John Hancock had been put on notice by Dubose that certain contractors had not yet been paid. Specifically, Plaintiffs alleged that "[o]n July 28, 2000, McMo received the final payment. Sometime later, McMo told John Hancock that McMo would not pay the Fabricator/Suppliers. No later than July 21, 2000, John Hancock had known that any balance due to McMo was insufficient to pay known contractors' claims."

Hancock? If an agent of John Hancock, then McMo's actions bind John Hancock regardless of Plaintiffs failure to file a timely stop-payment notice under § 85-7-181. If a general contractor, Plaintiffs are arguably mere subcontractors, and § 85-7-181 controls. Assuming such, Plaintiffs failure to file a timely stop-payment notice would preclude recovery against John Hancock. (2) Were Plaintiffs required to be in privity with John Hancock in order to establish contractual obligations between the parties? If the answer is yes, then the absence of privity between Plaintiffs and John Hancock in the John Hancock-McMo contract and the lack of privity between John Hancock and Plaintiffs in the agreements between McMo and Plaintiffs, renders the Plaintiffs contractual obligation argument null. If the answer is no, however, then Plaintiffs may establish that John Hancock had an obligation to pay them under a third-party beneficiary theory.

¶8. "This Court does not sit to redetermine questions of fact." *In re City of Horn Lake,* 630 So. 2d 10, 19 (Miss. 1993) (citing *Johnson v. Black,* 469 So. 2d 88, 90 (Miss. 1985)). However, a de novo standard of review is applied to questions of law, *see G.B. "Boots" Smith Construction Corp. v. Cobb,* 860 So. 2d 774, 777 (Miss. 2003), legal conclusions, *see Andrew Jackson Life Insurance Co. v. Williams,* 566 So. 2d 1172, 1183-84 (Miss. 1990), and jurisdictional questions, *see McCain Builders, Inc. v. Rescue Rooter, LLC,* 797 So. 2d 952, 954 (Miss. 2001).

¶9. Under Rule 56(c) of the Mississippi Rules of Civil Procedure, "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ.

P. 56(c). "This Court employs a de novo standard in reviewing a trial court's grant of summary judgment." ***Noxubee County Sch. Dist. v. United Nat'l Ins. Co.,*** 883 So. 2d 1159, 1163 (Miss. 2004) (citing ***O'Neal Steel, Inc. v. Millette,*** 797 So. 2d 869, 872 (Miss. 2001)). "In conducting the de novo review, this Court looks at all evidentiary matters, including admissions in pleadings, answers to interrogatories, depositions, and affidavits." ***Id.*** (citing ***Lee v. Golden Triangle Planning & Dev. Dist., Inc.,*** 797 So. 2d 845, 847 (Miss. 2001)). "This evidence must be viewed in the light most favorable to the party against whom the motion for summary judgment has been made." ***Id.*** (citing ***Hartford Cas. Ins. Co. v. Halliburton Co.,*** 826 So. 2d 1206, 1209 (Miss. 2001)). "If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed." ***Mabus v. St. James Episcopal Church,*** 884 So. 2d 747, 756 (Miss. 2004). However, to constitute a triable issue of fact, the genuine dispute must regard a material issue of fact. *See* ***Leffler v. Sharp,*** 891 So. 2d 152, 156 (Miss. 2004). In other words, "the non-moving party cannot just sit back and remain silent, but ... must rebut by producing significant probative evidence showing that there are indeed genuine issues of material fact." ***Murphree v. Fed. Ins. Co.,*** 707 So. 2d 523, 529 (Miss. 1997) (citing ***Fruchter v. Lynch Oil Co.,*** 522 So. 2d 195, 198-99 (Miss. 1988)).

## I.    Is McMo a general contractor or an agent of John Hancock?

### A.

¶10.    With respect to general principles of agency, "the line between an agent and an independent contractor is not really a line but a 'twilight zone,' with the answer inevitably

9

revolving around the idea of control." ***Kight v. Sheppard Bldg. Supply, Inc.,*** 537 So. 2d 1355, 1359 (Miss. 1989) (citing ***Fruchter,*** 522 So. 2d at 199). According to this Court:

> an agent is one who stands in the shoes of his principal; he is his principal's alter ego ... . An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by [his] authority ... The most characteristic feature of an agent's employment is that he is employed primarily to bring about business relations between his principal and third persons ... .

***First Jackson Secs. Corp. v. B.F. Goodrich Co.,*** 253 Miss. 519, 532, 176 So. 2d 272, 278 (1965) (quoting 2 C.J.S. *Agency* § 1c, at 1024 (1936)). *See also* Restatement (Third) of Agency § 1 (Tentative Draft No. 2, 2001) (the key to the concept of "agency" is that the agent acts on the principal's behalf and is subject to the principal's control).

¶11. While John Hancock alleges that McMo was a general contractor, Plaintiffs maintain that McMo, as "construction manager," was an agent of John Hancock. This Court has defined a general contractor as "the party to a building contract who is charged with the total construction and who enters into sub-contracts for such work as electrical, plumbing and the like." ***Associated Dealers,*** 589 So. 2d at 1247-48 (quoting Black's Law Dictionary 349 & 621 (5th ed. 1983)). The term "construction manager" has not yet been defined in Mississippi. Other courts have defined the term, however, finding that "[a] general contractor and a construction manager are separate and distinct titles with different responsibilities and different relationships to the parties to a construction project." ***R&A Constr. Corp. v. Queens Boulevard Extended Care Facility Corp.,*** 290 A.D.2d 548, 549, 736 N.Y.S.2d 423 (N.Y. App. Div. 2002). *See also* ***Baum v. Ciminelli-Cowper Co.,*** 300 A.D.2d 1028, 1029, 755 N.Y.S.2d 138, 139-40 (N.Y. App. Div. 2002) (the existence of a distinction between "general

contractor" and "construction manager" is a question of fact for trial on the merits). While "[t]here is no single, widely accepted definition of construction management," ***Sagamore Group, Inc. v. Comm'r of Transp.,*** 614 A.2d 1255, 1259 (Conn. Ct. App. 1992), the Plaintiffs cite the distinction drawn between a general contractor and a construction manager by the Rhode Island Supreme Court in ***Brogno v. W&J Associates, Ltd.,*** 698 A.2d 191, 194 (R.I. 1997). The ***Brogno*** Court found that "the [construction manager] acts as a mere agent for a project's owner and ... engages 'trade contractors' in his principal's name to perform most or all of the actual work." ***Id.*** (quoting ***Bethlehem Rebar Indus., Inc. v. Fid. & Deposit Co.,*** 582 A.2d 442 (R.I. 1990)). *See also* ***Sagamore Group,*** 614 A.2d at 1259 ("Today ... [a construction manager] is more commonly a group, a company, or a partnership with two paramount characteristics: construction know-how and management ability."). On the other hand, a general contractor "is in the chain of liability and ... hires 'subcontractors' in his own name to perform work." ***Brogno,*** 698 A.2d at 194 (quoting ***Bethlehem Rebar,*** 582 A.2d at 442). The ***Brogno*** Court also added that "the mere self-serving label of [construction manager] or general contractor will not in and of itself determine a party's legal status." ***Id.***

¶12. Plaintiffs' argument essentially operates as follows: Plaintiffs were designated as "Contractor[s]" in both the McMo-John Hancock contract and in their respective agreements with McMo; McMo was referred to as a "construction manager" in each Plaintiff's agreement with McMo; and McMo inspected and approved Plaintiffs work product, then approved Plaintiffs demands for payment by John Hancock who, by contract, was to route payments to Plaintiffs through McMo. Therefore, the argument flows, McMo was acting not as a general

11

contractor, but rather as an agent of John Hancock. Such an agency relationship, Plaintiffs argue, deductively creates a direct contractual relationship between Plaintiffs and John Hancock, making the stop-notice limitations of § 85-7-181 inapplicable. Since agency is a question of material fact, *see Engle Acoustic & Tile, Inc. v. Grenfell,* 223 So. 2d 613, 617 (Miss. 1969), it is unsuited to resolution by motion for summary judgment. *See Murphree,* 707 So. 2d at 529.

¶13. John Hancock responds by arguing that the use of the term "construction manager" does not automatically create an agency relationship. *Brogno,* 698 A.2d at 194 (quoting *Bethlehem Rebar,* 582 A.2d at 442). *See also Kight,* 537 So. 2d at 1359 (what parties to a contract actually do provides the best evidence of what the contract required them to do). John Hancock argues that McMo fits the *Associated Dealers* definition of a general contractor because it had total responsibility and control over renovations at the mall and entered into the contracts with Plaintiffs to supply labor and material for those renovations. Not only was McMo expressly referred to as an "independent contractor" in the McMo-John Hancock contract, but the nature of their performance reflected that intent. The contracts between McMo and Plaintiffs were executed with McMo, with no signature line provided for John Hancock; none of the contracts stated that McMo was acting as John Hancock's agent; and none of the Plaintiffs were privy to the contract between McMo and John Hancock. Moreover, McMo had total control over the manner and means of performance under its contract with John Hancock. As a result, John Hancock alleges that Plaintiffs are simply attempting to create a disputed issue of material fact where none actually exists (i.e. the entire "construction manager" question is a strawman). In essence, John Hancock argues that Plaintiffs failed to

assert their statutory rights as subcontractors under § 85-7-181 and are now seeking to hold John Hancock responsible for the Plaintiffs' own mistake. ¶14. "[W]hether an agency has in fact been created is to be determined by the relations of the parties as they exist under their *agreements or acts*, with the question being ultimately one of *intention*." **Engle,** 223 So. 2d at 617-18 (emphasis added). The burden of proof as to the existence of an agency relationship rests with the party asserting it. *See* **Booker ex rel. Certain Underwriters at Lloyd's of London v. Pettey,** 770 So. 2d 39, 45 (Miss. 2000). Thus, the burden of proof here lies with the Plaintiffs.

¶15. The agency arguments of both parties focus upon the existence of a general, overarching agency relationship between John Hancock and McMo. In the John Hancock-McMo contract, agency is in no way mentioned[16] and the agreement attempts to expressly establish the independent contractor status of McMo.[17] However, "[o]ur law recognizes that a person may be an independent contractor as to certain work and a mere agent as to other work for the same employer." **Kight,** 537 So. 2d at 1359 (citing **Carroll v. E.G. Lauglin & Sons,** 220 Miss. 535, 540, 71 So. 2d 461, 463 (1954); **Mills v. Jones' Estate,** 213 Miss. 680, 684, 56 So. 2d 488, 490 (1952)). The heart of the dispute, the lack of payment receipt by Plaintiffs, without doubt involves an agency relationship between John Hancock and McMo.[18] The "Manage

---

[16]Although the Project Profile section of the John Hancock-McMo contract states, "[s]imilarly, in the latter phases our role shall be construction leader, *acting in the interests of [John Hancock] ... .*" (emphasis added).

[17]But see n.7.

[18]An "agent" is "[o]ne who is authorized to act for or in place of another; a representative." Black's Law Dictionary 68 (8th ed. 2004). McMo arguably fits within this

13

Construction Funds and Pay Applications" provision of the John Hancock-McMo agreement provides, "[McMo] will receive, process and approve all applications for payment submitted by the Fabricator/Suppliers. We will submit a summarized package to [John Hancock] on a monthly basis containing all approved pay applications and necessary paperwork for *check preparation by [John Hancock]. [John Hancock] will route all payments through McMo*." (emphasis added). Although John Hancock artfully argues that McMo had sole control over the manner and means of its performance, there is evidence that John Hancock contractually obligated itself and factually controlled the manner of payment to the Plaintiffs.

¶16. Under general principles of agency law, "[o]ne who acts through another is in law himself the actor." ***Fruchter,*** 522 So. 2d at 199 (citing ***Slaughter v. Holsomback,*** 166 Miss. 643, 659, 147 So. 318, 322 (1933)). As stated in John Hancock's Complaint filed in the Circuit Court of Hillsborough County, Florida, against McMo for conversion, "[t]he Vendor Funds Escrow payments were specific identifiable deposits of money belonging to [John Hancock] which it *entrusted* to McMo for the *specific purpose of paying* the subcontractors or *suppliers* who had furnished the labor or materials to the Project, as requested in each Pay Application McMo submitted to [John Hancock]." (emphasis added). The existence of escrow funds, specifically the Vendor Funds Escrow payments involved here, inherently presumes that

---

general definition of "agent" with respect to the payment of Plaintiffs by John Hancock. Moreover, McMo arguably also corresponds with the Black's Law Dictionary definition of a "special agent" ("[a]n agent employed to conduct a particular transaction or to perform a specified act"), *id.* at 70, a "managing agent" ("[a] person with general power involving the exercise of judgment and discretion, as opposed to an ordinary agent who acts under the direction and control of the principal"), *id.*, an "*escrow agent*" ("*[t]he third-party depositary of an escrow*"), *id.* at 69, and/or a "general agent" ("[a]n agent authorized to transact all the principal's business of a particular kind or in a particular place"). *Id.*

14

the party receiving escrow funds shall act as the escrow *agent* for proper disbursement, which in the case sub judice, was payment to the Plaintiffs. McMo was unquestionably an escrow *agent* for John Hancock here, as payments from the Vendor Funds Escrow account were contractually to be routed through McMo for payment to the Fabricator/Supplier-Plaintiffs, and John Hancock should be estopped from now seeking to presently disclaim such judicial admission.

¶17. McMo was contractually referred to as a "construction manager" hired to perform "design, construction documentation and project management consulting services" for John Hancock. Indeed, the McMo statements to John Hancock are titled "Consulting Invoice(s)" and the payments requested for Plaintiffs are separately listed from McMo's service charges, under "Service Description" as "Vendor Funds Escrow."

¶18. A general contractor is "charged with the total construction," *Associated Dealers,* 589 So. 2d at 1247, not mere "project management services." A "manager" is "[a] person who administers or supervises the affairs of a business, office, or other organization." Black's Law Dictionary 979 (8th ed. 2004). This definition bears close resemblance to the definition of a "special," "managing," or "general" agent.[19] As a "construction manager," McMo clearly fits within such agency definitions. McMo was contractually required to recommend Fabricator/Suppliers to John Hancock, to act as the conduit for routing payments to Plaintiffs, and to act in the interests of John Hancock, all of which are genuine issues of contested material facts regarding the existence of an agency relationship between John Hancock and McMo.

---

[19]See n.18.

¶19.     Fundamentally, "an entity which acts as agent for an owner intending no profit from the construction itself is *not* a contractor or master workman for the purposes of § 85-7-181." *Associated Dealers,* 589 So. 2d at 1249 (Lee, P.J., dissenting) (citing *Graham v. Pugh,* 417 So. 2d 536, 540 (Miss. 1982) (company is deemed an agent of owner as it was not to undertake the work itself and was not to make any profit from the construction job itself)).   Actual construction was performed by the Plaintiffs.   McMo sought no profit on the construction performed by Plaintiffs, but rather acted as the conduit for transferring John Hancock's payments to Plaintiffs.   The debt due the Plaintiffs was not extinguished by John Hancock's payments to McMo, only John Hancock's debt to McMo was extinguished.   McMo's profit was relegated to its own professional fees[20] and potential cost savings realized in the Construction Budget.[21]   If McMo's role regarding the payment of Plaintiffs was not as a contractor or master workman, but as an agent, then § 85-7-181 is altogether inapplicable.

**B.**

---

[20]Consisting of design services in Phase 1, construction documentation services in Phase 2, and project management services in Phase 3.

[21]"Cost Savings Split. [John Hancock] and McMo will split evenly (50/50) any savings realized in the Construction Budget for the construction of the Scope of Work outline herein."

¶20.    Furthermore, McMo's status as a general contractor is called into question by its failure to obtain a contractor's license in the state of Mississippi.  Miss. Code Ann. § 31-3-15 states that:

> No contract for public or private projects shall be issued or awarded to any contractor who did not have a current certificate of responsibility issued by said board [the Mississippi Board of Public Contractors] at the time of the submission of the bid, or a similar certificate issued by a similar board of another state which recognizes certificates issued by said board.  Any contract issued or awarded in violation of this section shall be null and void.

Miss. Code Ann. § 31-3-15 (Rev. 2005).  "[T]he certificate of responsibility serves to protect owners from 'incompetent, inexperienced, unlawful and fraudulent acts of contractors,' by making null and void any contracts for construction for which a certificate of responsibility should have been issued." *Associated Dealers,* 589 So. 2d at 1248 (citing Miss. Code Ann. §§ 31-3-1, -2, & -15 (1972)).[22]   While Steven Mordue and Tom McCurdy of McMo both claimed to have held a Florida specialty license for signs, no proof of licensing in Mississippi was forthcoming.   The record provides no insight into whether the Florida specialty license was accompanied by a certificate of responsibility or whether such a certificate, if present, would be recognized in Mississippi under § 31-3-15.   Therefore, additional genuine issues of material fact exist regarding the validity of McMo's contracts with the Plaintiffs.

## II.    Privity of Contract

---

[22]*But see **Timberton Golf, L.P. v. McCumber Constr., Inc.,*** 788 F. Supp. 919, 925 (S.D. Miss. 1992) (in spite of § 31-3-15, Florida contractor's failure to obtain Mississippi certificate of responsibility did not void an arbitration agreement contained within a contract to develop a golf course).

¶21. John Hancock asserts that it was not privy to the contracts between McMo and Plaintiffs and Plaintiffs were not privy to the John Hancock-McMo contract. However, privity is not required to establish contractual obligations. A third party can enforce a contractual provision made primarily for his benefit even if he was not a party to the contract. *See Burns v. Washington Sav.,* 251 Miss. 789, 171 So. 2d 322, 324 (1965). As to such third-party beneficiaries,

> the controlling principle of law ... is that one not a party to a contract can sue for a breach thereof only when the condition which is alleged to have been broken was placed in the contract for his direct benefit. A mere incidental beneficiary acquires by virtue of the contractual obligation no right against the promisor or the promisee.

*Hartford Accident & Indem. Co. v. Hewes,* 190 Miss. 225, 234, 199 So. 93, 95 (1940). *See also Yazoo & M.V.R.R. v. Sideboard*, 161 Miss. 4, 133 So. 669, 671 (1931) ("(1) When the terms of the contract are expressly broad enough to include the third party either by name [or] as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract."). In other words,

> for the third person beneficiary to have a cause of action, the contracts between the original parties must have been entered into for his benefit, or at least such benefit must be the direct result of the performance within the contemplation of the parties as shown by its terms. There must have been a legal obligation or duty on the part of the promisee to such third person beneficiary. ... connect[ing] the beneficiary with the contract.

18

***Burns,*** 171 So. 2d at 325. In making this determination, the "primary purpose of [the] provisions," ***Chic Creations of Bonita Lakes Mall v. Doleac Elec. Co.,*** 791 So. 2d 254, 259 (Miss. Ct. App. 2000), ought to be considered.

**A.**

¶22. The "Negotiate Construction Agreement(s)" provision expressly states that, "[McMo] will negotiate with the Fabricator/Suppliers *mutually selected* by [John Hancock] and McMo for the *execution of agreements between the Fabricator/Suppliers and [John Hancock].*" (emphasis added). Plaintiffs are directly referenced under the terms of the "Negotiate Construction Agreement(s)" provision as the "Fabricator/Suppliers." Clearly, each Plaintiff is a party whose performance was contemplated.

**B.**

¶23. Under the "Manage Construction Funds and Pay Applications" provision, John Hancock assumed the obligation to pay Plaintiffs, albeit through McMo. John Hancock has admitted as much, by its declaration in the Florida proceeding against McMo, *supra*. Therefore, Plaintiffs' status vel non as third-party beneficiaries of the John Hancock-McMo agreement is a contested issue of material fact.

**CONCLUSION**

¶24. Only if McMo was a general contractor and Plaintiffs were subcontractors, would they be required to utilize the protections afforded by § 85-7-181, and if they did not employ such protection, the burden of this unfortunate loss would be borne by them. However, if they establish the existence of an agency relationship between John Hancock and McMo, their status as third-party beneficiaries of the John Hancock-McMo contract, McMo's lack of

19

general contractor status, or the invalidity of the McMo contract, then John Hancock's payments to McMo would not extinguish its debt to the Plaintiffs.

¶25. As Plaintiffs can arguably establish any of the aforementioned, this Court holds that the chancellor erred in granting John Hancock's motion for summary judgment. Viewing the record in the light most favorable to Plaintiffs, triable issues of fact exist regarding all of these issues. Therefore, the trial court's judgment is reversed, and this case is remanded to the trial court for a trial on the merits consistent with this opinion.

¶26. **REVERSED AND REMANDED**.

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**